**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN 249203)
ak@kazlg.com
Mona Amini (SBN 296829)
mona@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

*Attorneys for Plaintiffs*
Annette Brock and George Santos

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNETTE BROCK and GEORGE SANTOS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>AVEN FINANCIAL, INC.,<br><br>        Defendant. | Case No.:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF:<br><br>1. CALIFORNIA CONSUMER PRIVACY ACT OF 2018, CAL. CIV. CODE §§ 1798.100, *et seq.*;<br>2. CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, *et. seq.*;<br>3. BREACH OF CONTRACT; and<br>4. NEGLIGENCE<br><br>JURY TRIAL DEMANDED |

//
//
//
//
//
//
//
//

Plaintiffs ANNETTE BROCK and GEORGE SANTOS ("Plaintiffs"), individually and on behalf of the general public and all others similarly situated (the "Class members"), by and through their attorneys, upon personal knowledge as to facts pertaining to themselves and on information and belief as to all other matters, brings this class action against AVEN FINANCIAL, INC. ("Defendant" or "Aven") and allege as follows:

## NATURE OF THE CASE

1. This is a data breach class action arising out of Defendant's failure to implement and maintain reasonable security practices to protect consumers' sensitive personal information. For its business purposes, Defendant stores and transmits personally identifiable information ("PII") from customers including, but not limited to, names, Social Security numbers, driver's license numbers, dates of birth, and other sensitive personal information.

2. On or about July 17, 2023, an unauthorized third party accessed Defendant's system and containing personal information and exfiltrated Plaintiffs' and the Class members' PII, including their names, Social Security numbers, driver's license numbers, dates of birth, and other personal information (the "Data Breach").

3. Defendant's "Notice of Data Breach" letter sent to Plaintiffs and other affected individuals on or around July 28, 2023, was misleading and inadequate and did not provide great detail regarding how the Data Breach occurred. Further, Defendant's letter failed to indicate whether any information accessed and/or exfiltrated by the unauthorized person was recovered.

4. Defendant owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard the PII it collected from consumers for business purposes and stored on its systems or networks. This included ensuring information would not be shared with unauthorized parties and that all third-party providers had security procedures in place to maintain

the security and integrity of any data to which Defendant gave them access and sufficiently prevented unauthorized access to Defendant's systems.

5.    Defendant breached that duty by, *inter alia*, failing to implement and maintain reasonable security procedures and practices to protect PII from unauthorized access and storing and retaining Plaintiffs' and Class members' personal information on inadequately protected systems. It also breached that duty by failing to monitor, test and ensure third-parties to which it gave access to customer data had adequate security controls.

6.    The Data Breach happened because of Defendant's inadequate cybersecurity, which caused Plaintiffs' and Class members' PII to be accessed, exfiltrated, and disclosed to unauthorized third parties in the Data Breach. This action seeks to address and remedy these failings. Plaintiffs bring this action on behalf of themselves and all affected California residents.

7.    As set forth in the Prayer for Relief, among other things, Plaintiffs seeks, for themselves and the Class members, injunctive relief, including public injunctive relief, and actual damages.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

9.    This Court has personal jurisdiction over Defendant because Defendant maintains a principal place of business within this District in San Mateo County, California and regularly conducts business in California.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in, was directed to, and/or emanated from this District.

## PARTIES

11.    Plaintiff Annette Brock resided in Riverside County, California.

12.    Plaintiff George Santos is a resident of Burlington County, New Jersey.

13.    Sometime prior to July 17, 2023, Defendants received or obtained Plaintiffs' personal information and/or Plaintiffs provided their personal information to Defendant with the expectation that this information would be kept secure and not disclosed to unauthorized parties.

14.    On or around July 28, 2023, Defendant sent Plaintiffs a letter with the subject "Notice of Data Breach." The notice informed Plaintiffs and other similarly situated Class members that an unauthorized third party had gained access to Defendant's system containing their personal information, or PII, including names, Social Security numbers, driver's license numbers, dates of birth, and other personal information, on July 17, 2023.

15.    After receiving the "Notice of Data Breach" letter, Plaintiffs spent considerable time and effort taking actions to attempt to mitigate the impact of the Data Breach, including monitoring accounts and contacting credit bureaus to freeze their credit. This is time Plaintiffs otherwise would have spent performing other activities or leisurely events for the enjoyment of life and this loss of time was a direct result of the Data Breach.

16.    As a result of the Data Breach, Plaintiffs have suffered invasion of privacy and emotional distress as a result of the release of their PII, which Defendant had a duty to protect from unauthorized disclosure, including anxiety, concern, and uneasiness about unauthorized parties viewing and potentially using their personal information, as well as unease about Defendant having additional data breaches or otherwise disclosing their personal information in the future. In addition to Plaintiffs suffering actual injury from lost time, invasion of privacy, Plaintiffs also suffer the imminent and continuing injury arising from the heightened risk of fraud and identity theft due to the Data Breach.

17.     As a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the personal information it collected and maintained, Plaintiffs' PII was accessed, exfiltrated, and otherwise disclosed in the Data Breach.

18.     Defendant is a corporation formed under the laws of the State of Delaware with a principal place of business located at 330 Primrose Road, Suite 412, Burlingame, CA in San Mateo County, California.

19.     The agents, servants and/or employees of the Defendant and each of them acting on behalf of the Defendant acted within the course and scope of his, her or its authority as the agent, servant and/or employee of the Defendant, and personally participated in the conduct alleged herein on behalf of the Defendant with respect to the conduct alleged herein.

## FACTUAL ALLEGATIONS

### *PII Is a Valuable Property Right that Must Be Protected*

20.     The California Constitution guarantees every Californian a right to privacy. And PII is a recognized valuable property right.[1] California has repeatedly recognized this property right, most recently with the passage of the California Consumer Privacy Act of 2018.

21.     In a Federal Trade Commission ("FTC") roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored the property value attributed to PII by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[2]

---

[1]     *See* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *2 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[2]     FTC, *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009), https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable.

22.     The value of PII as a commodity is measurable. "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[3] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" for several years.

23.     Companies recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market.[4]

24.     As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals openly post credit card numbers, Social Security numbers, PII and other sensitive information directly on various illicit Internet websites making the information publicly available for other criminals to take and use. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims. In one study, researchers found hundreds of websites displaying stolen PII and other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list."

25.     Recognizing the high value that consumers place on their PII, some companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information they share – and who ultimately receives that information. By making the transaction transparent, consumers will make a profit from the surrender of

---

[3]     *See* Soma, *Corporate Privacy Trend, supra*.
[4]     Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html.

their PII.[5] This business has created a new market for the sale and purchase of this valuable data.[6]

26. Consumers place a high value not only on their PII, but also on the privacy of that data. Researchers shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[7]

27. One study on website privacy determined that U.S. consumers valued the restriction of improper access to their PII between $11.33 and $16.58 per website.[8]

28. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII Has Grave and Lasting Consequences for Victims*

29. A data breach is an incident in which sensitive, protected, or confidential data has potentially been viewed, stolen, or used by an individual unauthorized to do so. As more consumers rely on the internet and apps on their phone and other devices to conduct every-day transactions, data breaches are becoming increasingly more harmful.

30. Theft or breach of PII is serious. The California Attorney General recognizes that "[f]oundational" to every Californian's constitutional right to privacy is "information security: if companies collect consumers' personal data, they have a

---

[5]    Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times (July 16, 2010) *available at* https://www.nytimes.com/2010/07/18/business/ 18unboxed.html.
[6]    *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011) *available at* https://www.wsj.com/articles/SB10001424052748703529004576 160764037920274.
[7]    Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), *available at* https://www.jstor.org/stable/23015560?seq=1# page_scan_tab_contents.
[8]    II–Horn, Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at table 3, *available at* https://ideas.repec.org/p/wpa/wuwpio/0304001.html (emphasis added).

duty to secure it. An organization cannot protect people's privacy without being able to secure their data from unauthorized access."[9]

31.    The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use PII to take over existing financial accounts, open new financial accounts, receive government benefits and incur charges and credit in a person's name.[10] As the GAO Report states, this type of identity theft is so harmful because it may take time for the victim to become aware of the theft and can adversely impact the victim's credit rating.

32.    In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records … [and their] good name." According to the FTC, identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[11]

33.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[12] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks;

_____

[9]      California Data Breach Report, Kamala D. Harris, Attorney General, California Department of Justice, February 2016.
[10]     *See* GAO, GAO Report 9 (2007) *available at* http:///www.gao.gov/new.items/d07737.pdf.
[11]     *See* FTC Identity Theft Website: https://www.consumer.ftc.gov/features/feature-0014-identity-theft.
[12]     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[13]

34.   According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[14] Other estimates have placed the costs even higher. The 2013 Norton Report estimated that the average cost per victim of identity theft – a common result of data breaches – was $298 dollars.[15] And in 2019, Javelin Strategy & Research compiled consumer complaints from the FTC and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[16]

35.   A person whose PII has been compromised may not see any signs of identity theft for years. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

36.   For example, in 2012, hackers gained access to LinkedIn's users' passwords. However, it was not until May 2016, four years after the breach, that hackers released the stolen email and password combinations.[17]

37.   It is within this context that Plaintiffs and thousands of other individuals subjected to the Data Breach must now live with the knowledge that their PII was

---

[13]   *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 7, 2017), *available at* https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.
[14]   Brook, *What's the Cost of a Data Breach in 2019*, *supra*.
[15]   Norton By Symantec, 2013 Norton Report 8 (2013), *available at* https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.
[16]   Facts + Statistics: *Identity Theft and Cybercrime*, Insurance Information Institute, *available at* https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).
[17]   *See* Cory Scott, *Protecting Our Members*, LINKEDIN (May 18, 2016), *available at* https://blog.linkedin.com/2016/05/18/protecting-our-members.

disclosed to unauthorized persons, is likely forever in cyberspace and likely available for sale on the dark web or black market.

*Defendant's Business*

38.     Defendant is a financial company, creditor, or lender, that partners with Coastal Community Bank to issue and/or service Visa credit cards, loans, or credit products linked to homeowners' home equity.

39.     When consumers apply for or receive credit with or through Defendant, they are required to, and ultimately provide, Defendant with certain personal information. The personal information required to make an account includes the consumer's name, contact information, social security number, driver's license number, financial information including income, account balances and payment history, credit history and credit scores.

*Defendant's Collection of Customers' PII*

40.     Defendant acknowledges that it collects, stores, and transmits a substantial amount of personal information from consumers, including when they apply for a loan, give Defendant income information, open an account with Defendant, use a credit card, or pay their bills. The type of information is detailed in Defendant's Privacy Policy (last revised March 2023),[18] states Defendant collects, at minimum, the following categories of personal information, or PII, from consumers:

- Social Security Number and income
- accounts balances and payment history
- credit history and credit score

41.     Defendant collects personal information from California customers when they:

- Apply for a loan
- Give Aven their income information

---

[18] *See* Defendant's Privacy Policy: https://www.aven.com/docs/ConsumerPrivacyPolicyNotice.pdf

- Open an account
- Use their credit card
- Pay their bills

Aven also collects personal information from others, such as credit bureaus, affiliates, or other companies.

### *Defendant's Promises to Safeguard Customer PII*

42.  Defendant represents and claims that: "To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. We authorize our employees to obtain your information only when they need it to do their work and we require companies that work for us to protect your information."[19]

43.  Defendant's Terms of Service agreement incorporates by reference Defendant's Privacy Policy.[20]

### *The Data Breach*

44.  On July 28, 2023, Defendant reported the Data Breach to the California Attorney General, among other states' agencies.

45.  Also, on July 28, 2023, Defendant sent Plaintiffs and its other consumers a letter with the subject line, "Notice of Data Breach." According to Defendant, the Data Breach involved Plaintiffs' and the Class members' name, social security number, driver's license number, date of birth, and other personal information.

46.  Defendant offered a limited number of steps on how to protect against identity theft and fraud. These steps included reviewing account statements and credit reports, placing a fraud alert and requesting a "security freeze" on their credit files for fraudulent or irregular activity on a regular basis.



---

[19] *See* Defendant's Privacy Policy: https://www.aven.com/docs/ConsumerPrivacyPolicyNotice.pdf
[20] *See* Defendant's Terms of Service: https://www.aven.com/public/docs/TermsOfService

47.    The Notice of Data Breach letter does not identify the rights of California consumers under CCPA.

### Defendant Knew or Should Have Known PII Are High Risk Targets

48.    Defendant knew or should have known that PII like that at issue here, are high risk targets for identity thieves.

49.    The Identity Theft Resource Center reported that the business sector had the largest number of breaches in 2018. According to the ITRC this sector suffered 571 data breaches exposing at least 415,233,143 million records in 2018.[21] Further, the ITRC identified "hacking" as the most common form of data breach in 2018, accounting for 39% of data breaches.

50.    Prior to the breach there were many reports of high-profile data breaches that should have put a company like Defendant on high alert and forced it to closely examine its own security procedures, as well as those of third parties with which it did business and gave access to its subscriber PII. Notable breaches included Capital One, which announced that in March 2019 a hacker had gained access to 100 million U.S. customer accounts and credit card applications. Similarly, in December 2018, Marriott International announced a data breach that affected up to 500 million individuals. The data breach allowed hackers to access customer names, physical addresses, phone numbers, email addresses, passport numbers, dates of birth, gender, loyalty program account information, and payment card information.[22]

51.    As such, Defendant was aware that PII is at high risk of theft, and consequently should have but did not take appropriate and standard measures to protect

---

[21]    Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at* https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[22]    *See* https://www.consumer.ftc.gov/blog/2018/12/marriott-data-breach#:~:text=Marriott%20International%20says%20that%20a,up%20to%20500%20million%20people.&text=The%20hotel%20chain%20says%20the,10%2C%202018%20could%20be%20affected

Plaintiffs' and Class members' PII against data breaches and unauthorized disclosures that Defendant should have anticipated and guarded against.

## CLASS DEFINITION AND ALLEGATIONS

52. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seeks to represent and intend to certify a class defined as (the "Class"):

*All individuals whose PII was subjected to the Data Breach.*

53. Excluded from the Class are: (1) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, agents, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

54. Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of his claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

55. The Class members are so numerous and geographically dispersed throughout California that joinder of all Class members would be impracticable. While the exact number of Class members is unknown, Defendant acknowledges the Data Breach, and Defendant's reporting of the Data Breach to the California Attorney General concedes the Data Breach involved the unencrypted PII of over 500 California residents. Plaintiffs therefore believe that the Class is so numerous that joinder of all members is impractical.

56. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

57.    There is a well-defined community of interest in the common questions of law and fact affecting Class members. The questions of law and fact common to Class members predominate over questions affecting only individual Class members, and include without limitation:

> (a)    Whether Defendant had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected from Plaintiffs and Class members;
>
> (b)    Whether Defendant breached its duty to protect the PII of Plaintiffs and Class members; and
>
> (c)    Whether Plaintiffs and Class members are entitled to damages and other equitable relief.

58.    Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are each an adequate representative of the Class in that they has no interests adverse to or that conflicts with the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

59.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy since individual joinder of all Class members is impractical. Furthermore, the expenses and burden of individual litigation would make it difficult or impossible for the individual members of the Class to redress the wrongs done to them, especially given that the damages or injuries suffered by each individual member of the Class are outweighed by the costs of suit. Even if the Class members could afford individualized litigation, the cost to the court system would be substantial and individual actions would also present the potential for inconsistent or contradictory judgments. By contrast, a class action presents fewer management difficulties and provides the benefits of single adjudication and comprehensive supervision by a single court.

60.    Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive, including public injunctive relief, and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the California Consumer Privacy Act of 2018 ("CCPA")**
**Cal. Civ. Code §§ 1798.100,** *et seq.*

61.    Plaintiffs reallege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

62.    As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access. The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."[23]

63.    As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendant failed to implement such procedures which resulted in the Data Breach.

---

[23]    California Consumer Privacy Act (CCPA) Compliance, https://buyergenomics.com/ccpa-complience/.

64. It also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." 1798.81.5(c).

65. Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

66. Plaintiffs and Class members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

67. Defendant is a "business" as defined by Civ. Code § 1798.140(c) because Defendant:

  a. is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

  b. "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

  c. does business in California; and

  d. has annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for

commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

68.     The PII taken in the Data Breach is "personal information" as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiffs' and Class members' unencrypted names, social security numbers, driver's license numbers, dates of birth, and other personal information.

69.     Plaintiffs' PII was subject to unauthorized access, exfiltration, or disclosure because their PII, including name, Social Security number, and/or driver's license number, among other personal information was wrongfully disclosed and accessed by unauthorized third parties.

70.     The Data Breach occurred as a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiffs' and Class members' PII, including to ensure that its had sufficient security protocols in place to protect the PII to which Defendant maintained and/or gave third parties access to. Defendant failed to implement reasonable security procedures to prevent unauthorized access and disclosure of Plaintiffs' and Class members' PII as a result of this Data Breach.

71.     On or around August 28, 2023, Plaintiffs sent Defendant written notice of its violations of the CCPA, pursuant to Civil Code § 1798.150(b)(1). *See* Exhibit A. In the event Defendant does not, or is unable to, cure the violation within 30 days, Plaintiffs will amend their complaint to pursue statutory damages as permitted by Civil Code § 1798.150(a)(1)(A).

72.     As a result of Defendant's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiffs seek actual damages, injunctive relief, including public injunctive relief, and declaratory relief, and any other relief as deemed appropriate by the Court.

**SECOND CAUSE OF ACTION**
**Violation of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

73.     Plaintiffs re-allege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

74.     The UCL prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

75.     In the course of conducting its business, Defendant committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, California Consumer Privacy Act of 2018 (Cal. Civ. Code §§ 1798.100, *et seq.*) and Article I, Section 1 of the California Constitution (California's constitutional right to privacy) and Civil Code § 1798.81.5. Plaintiffs and Class members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

76.     Defendant also violated the UCL's unlawful prong by breaching contractual obligations created by its Privacy Policies and by knowingly and willfully or, in the alternative, negligently and materially violating Cal. Bus. & Prof. Code § 22576, which prohibits a commercial website operator from "knowingly and willfully" or "negligently and materially" failing to comply with the provisions of its posted

privacy policy. Plaintiffs and Class members suffered injury in fact and lost money or property as a result of Defendant's violations of its Privacy Policies.

77. Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution, and the FTC Act (15 U.S.C. § 45). The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

78. Plaintiffs and Class members suffered injury in fact and lost money or property as a result of Defendant's violations of its Privacy Policy and statutory and common law in that a portion of the money Plaintiffs and Class members paid, or that Defendant received, for Defendant's products and services went to fulfill the contractual obligations set forth in its Privacy Policy, including maintaining the security of their PII, and Defendant's legal obligations, and Defendant failed to fulfill those obligations.

79. The UCL also prohibits any "fraudulent business act or practice." Defendant's above-described claims, nondisclosures and misleading statements were false, misleading and likely to deceive the consuming public in violation of the UCL.

80. As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiffs and Class members

have suffered injury in fact and lost money or property as a result of Defendant's unfair and deceptive conduct. Such injury includes paying for a certain level of security for their PII but receiving a lower level, paying more for Defendant's products and services than they otherwise would have had they known Defendant was not providing the reasonable security represented in its Privacy Policy and as in conformance with its legal obligations. Had Plaintiffs and Class members known about Defendant's substandard data security practices they would not have purchased Defendant's products or services or would have paid less for them. Defendant's security practices have economic value in that reasonable security practices reduce the risk of theft of customer's PII.

81. Plaintiffs and Class members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing heightened increased risk of identity theft and identity fraud – risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) statutory damages under the CCPA, (v) deprivation of the value of their PII for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

82. Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiffs, therefore, on behalf of themselves, Class members, and the general public, also seeks restitution and an injunction, including public injunctive relief prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted

to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## THIRD CAUSE OF ACTION

### Breach of Contract

83.   Plaintiffs re-allege and incorporates by reference all proceeding paragraphs as if fully set forth herein.

84.   Plaintiffs and Class members entered into express or implied contracts with Defendant as set forth in its Terms of Service that included Defendant's promise to protect nonpublic personal information given to Defendant or that Defendant gathered on its own, from disclosure, as set forth in Defendant's Privacy Policy, which was posted on its website, and expressly incorporated into Defendant's Terms of Service.

85.   Plaintiffs and Class members performed their obligations under the contracts when they provided their PII to Defendant, or Defendant collected and maintained their PII, in relation to their account or credit card with Defendant.

86.   Defendant breached its contractual obligation to protect the PII Defendant gathered when the information was exposed to unauthorized third parties as part of the Data Breach.

87.   As a direct and proximate result of the Data Breach, Plaintiffs and Class members have been harmed and have suffered, and will continue to suffer, damages and injuries.

## FOURTH CAUSE OF ACTION

### Negligence

88.   Plaintiffs re-allege and incorporates by reference all proceeding paragraphs as if fully set forth herein.

89.   Defendant owed various duties to Plaintiffs and the Class, including pursuant to the CCPA, as alleged in detail above.  Defendant owed duties to Plaintiffs and the Class with regard to their manner of collection, transmission, sharing, and

maintenance of Plaintiffs' and the Class members' personal data, including PII, and were required to maintain reasonable security procedures and practices to safeguard Plaintiffs' and the Class members personal information.

90.    Defendant breached its respective duties by engaging in the conduct and omissions alleged above and in violation of the CCPA and UCL, as well as its Privacy Policy as alleged above.

91.    Defendant is both the actual and legal cause of Plaintiffs' and the Class' damages.

92.    Plaintiffs believe and thereon allege that as a proximate result of Defendant's negligence, Plaintiffs and the Class have suffered actual damages, invasion and loss of privacy, and emotional distress as described herein and above.

93.    Due to the egregious violations alleged herein, Plaintiffs assert that Defendant breached its duties in an oppressive, malicious, despicable, gross, and wantonly negligent manner. Defendant's conscious disregard for Plaintiffs' privacy right entitles Plaintiffs and the Class to recover punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Class respectfully requests that (i) this action be certified as a class action, (ii) Plaintiffs each be designated a representative of the Class, and (iii) Plaintiffs' counsel be appointed as counsel for the Class. Plaintiffs, on behalf of themselves and members of the Class further requests that upon final trial or hearing, judgment be awarded against Defendant for:

(i)     actual and punitive damages to be determined by the trier of fact;

(ii)    equitable relief, including restitution;

(iii)   pre- and post-judgment interest at the highest legal rates applicable;

(iv)    appropriate injunctive relief;

(v)     attorneys' fees and litigation expenses under Code of Civil Procedure § 1021.5 and other applicable law;

(vi)    costs of suit; and

(vii)   such other and further relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all issues so triable.


Dated: August 28, 2023                    Respectfully submitted,

                                          **KAZEROUNI LAW GROUP, APC**


                                   By:  _/s/ Abbas Kazerounian_
                                        Abbas Kazerounian, Esq.
                                        Mona Amini, Esq.
                                        245 Fischer Avenue, Unit D1
                                        Costa Mesa, California 92626
                                        Telephone: (800) 400-6808
                                        Facsimile:  (800) 520-5523

                                        *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT